NURNBERGER v. UNITED STATES.

(Circuit Court of Appeals, Eighth Circuit. October 28, 1907.)

No. 2,527.

1. PERJURY—INDICTMENT FOR SUBORNATION—SUFFICIENCY.

An indictment for subornation of perjury in procuring another to make a false oath or affidavit before the receiver of a land office to secure an entry of land, which avers that such oath or affidavit was made in support of "a certain application in writing to enter under the homestead laws of the United States, subject to entry at said land office," certain land described, is sufficient after verdict as showing that the land described was at the time public land of the United States subject to homestead entry at such land office.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 39, Perjury, § 95.]

2. INDICTMENT—OBJECTIONS TO SUFFICIENCY—HOW TAKEN.

Objections to the sufficiency of an indictment cannot be raised by objecting to the introduction of any evidence thereunder.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 27, Indictment and Information, § 462.]

3. PERJURY—HOMESTEAD ENTRY—FALSE OATH TO SUPPORT.

To support an indictment for subornation of perjury based on the alleged procurement of the making of a false affidavit or oath before the receiver or register of a land office in support of an application to enter land under the homestead law, it is not essential that the affidavit should have been subscribed as well as sworn to before such officer.

4. SAME—TRIAL—EVIDENCE.

On the trial of such an indictment, the tract book kept by the register of the land office is admissible in evidence to establish the fact that the lands to which the application related were public lands subject to homestead entry at such office, and it is competent for the register as a witness to explain the meaning of abbreviations used therein.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 39, Perjury, §§ 113, 114.]

5. CRIMINAL LAW—EVIDENCE—DEPARTMENT REGULATIONS.

A general regulation promulgated by the General Land Office respecting homestead entries of public land, for the government of the officers of local land offices, pursuant to authority given by Rev. St. § 2478 [U. S. Comp. St. 1901, p. 1586], becomes a part of the body of public laws of which the courts take judicial notice, and, where such a regulation was pertinent to the issue as to the criminal intent of a defendant charged with a criminal offense under the land laws as corroborating his testimony as to his understanding of the requirement of the law, by showing that such understanding was in accordance with that of the Land Department until after the alleged offense, he was entitled to have such regulation placed before the jury as a matter of evidence, and its exclusion was error.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 14, Criminal Law, § 706.

Judicial notice of public laws and regulations, see note to 44 C. C. A. 4.]

6. SAME — APPEAL — REVIEW — DISCRETION OF COURT — PERMITTING LEADING QUESTIONS.

While the permitting of leading questions is a matter resting in the sound discretion of the trial court, allowing a district attorney in a criminal case to ask questions of his own witnesses, who are not unwilling or unfriendly, which are leading and in a form to suggest the answer de-

156 F.—46

sired and call for a mere conclusion of the witness, is an abuse of discretion, and is prejudicial error.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 15, Criminal Law, § 3064.]

**7. PERJURY—TRIAL FOR SUBORNATION—EVIDENCE.**

On the trial of a defendant charged with subornation of perjury in procuring homestead entrymen to make the required oath that the entry was not made for the benefit of any other person, when in fact they had agreed to convey the land to defendant for a stipulated price as soon as they obtained title, it was error to refuse to permit defendant to testify that he made no such agreements, but that the agreements actually made, as he understood them, left the conveyance optional with the other parties or to other facts, which tended to show that his act was not willful nor corrupt, as required by the statute to constitute the crime charged.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 39, Perjury, § 115.]

**8. SAME—INSTRUCTIONS.**

Instructions, given on the trial of a defendant charged with subornation of perjury in procuring homestead entrymen to make false oaths, *held* erroneous and misleading, in that they authorized the jury to convict in case they found that any statement made by affiants in their affidavits was false and was intentionally sworn to, when there was evidence tending to show that some of the recitals in the affidavits respecting the intention to reside on and improve the land as affiants understood the law were not applicable to their entries, and that their act in swearing to the same was not therefore willful and corrupt, as required by Rev. St. § 2291, as amended by Act March 3, 1877, c. 122, § 2, 19 Stat. 404 [U. S. Comp. St. 1901, p. 1391], to constitute the crime of perjury.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 39, Perjury, § 135.]

Hook, Circuit Judge, dissenting.

In Error to the District Court of the United States for the District of North Dakota.

Charles E. Wolfe and W. S. Lauder, for plaintiff in error.

B. D. Townsend, Asst. U. S. Atty. (Patrick H. Rourke, U. S. Atty., on the brief).

Before SANBORN and HOOK, Circuit Judges, and PHILIPS, District Judge.

PHILIPS, District Judge. The plaintiff in error (hereinafter for convenience designated the defendant) was a Union soldier who served through the Civil War, and at the time of the indictment and trial he was 67 or 68 years old. After the War he lived at Bowling Green, in the state of Ohio. In 1879 he moved to Richland county, N. D., where he acquired lands from the government under the homestead, timber culture, and pre-emption laws. In 1900 he visited Ward county, N. D., where one of his sons had located in business. There was a large amount of public land in that vicinity where Minot, the local land office, is located. In the spring of 1900 he went to Bowling Green, Ohio, to visit his wife, who had been there some months on account of sickness. While there he met a number of his former comrades of the army, and they discussed the subject of locating homesteads in said Ward county. He obtained a power of attorney from a number of these soldiers to make entries for them under the homestead laws. Being advised that such powers of attorney were not permissible for

such purpose, he consulted with an attorney respecting the legality of contracts with soldiers concerning lands to be acquired under the homestead laws. The trend of this advice was that he could make contracts with them under which he could furnish the money to defray their expenses in making such entries and the necessary improvements on the lands, and that they might or might not, at their pleasure, convey the lands to him after they had obtained the title; but he could not make a contract that they should enter the lands for his use and benefit. He took several parties of these soldiers and the widows of deceased soldiers out to Ward county, where they made affidavits of application for such lands and effected such entries. He paid all the expenses of these trips, and for the entries, and constructed what are called "shacks" on the lands.

In the fall of 1903 he went to Ohio and organized the last party, composed of 12 widows of old soldiers, who made the entries in question. A form of contract was drawn up by a Mr. Comstock, a lawyer and comrade of the defendant, a resident of the locality in Ohio where these homesteaders lived, to be signed by them and the defendant, the substance of which was that the applicant agreed to go to the United States land office at Minot, N. D., and make due and legal entry upon lands selected for them by the defendant under the provisions of the homestead laws, and that the applicant would duly appear and make final proof and perfect title to the land, and when the title was perfected they agreed to sell the land to the defendant for the sum of $200, plus the expenses of one trip to the land office and return to Ohio; the $200 to be paid upon delivery of the deed. The defendant was to select and locate the land and make the improvements on the same before final proofs; the locator agreeing that until such deed was delivered as aforesaid, the defendant should have a prior lien upon the land for improvements so made and for money advanced for traveling expenses. This contract, it is conceded, was nonenforceable. The tenth count of the indictment was based upon an entry made by one Hall in 1902, under a claimed parol understanding with the defendant.

The defendant was indicted May 29, 1905, for subornation of perjury in procuring said entrymen of 1903 to make false affidavits before the register of the land office to secure said locations. The indictment contained 13 counts. Verdicts of guilty were returned on counts numbered 2, 3, 6, 7, 8, 9, and 10, and he was acquitted on the other counts. He was sentenced to the South Dakota penitentiary for a term of one year and to pay a fine of $300.

The first error assigned goes to the sufficiency of the indictment, based on the following objections: (1) That the indictment fails to charge that the land described at the times when the affidavits in question were made were public lands of the United States, over which the register and receiver of the land office at Minot had jurisdiction; (2) that the allegation "subject to entry at said land office" if referable to the lands at all is a mere conclusion of law; and (3) the indictment fails to state a case in which any oath was required or permitted to be administered.

The allegations of the indictment in the particulars assailed, common to all the counts, after laying the venue, are that the defendant in said district within the jurisdiction of the court:

"Then and there unlawfully did willfully and corruptly suborn, instigate and procure one Charles S. Ely to appear in person before the register and receiver of the United States land office at Minot, in the district aforesaid, and then and there, before T. E. Fox, then and there the receiver of the said land office, to make and subscribe, before him, the said T. E. Fox, receiver as aforesaid, a certain oath and affidavit in writing then and there required by the laws of the said United States, in support of a certain application in writing of him, the said Charles S. Ely, then and there made to the register of the said land office; that is to say, a certain application in writing to enter, under the homestead laws of the United States, subject to entry at the said land office (here is set out a description of the land), and by such oath and affidavit, so made in support of said application to enter the said lands, falsely to depose and swear, among other things in substance, and to the effect," etc.

This is followed by a statement of the contents of the affidavit made by the applicant, with allegations as to the falsity of the matters sworn to, the corrupt procurement thereof by the defendant, with averment of the authority of said Fox to administer said oath.

The application in writing, the allegation clearly enough discloses, was to make entry of homestead lands, specifically described, under the homestead laws of the United States subject to entry at the United States land office at Minot, N. D. The clear intendment is that the lands were public lands, and as such were at the time subject to entry at said United States land office. The allegations in this respect were quite as full and specific as those contained in the indictment in Stearns v. United States, 152 Fed. 900, 82 C. C. A. 48, held by this court to be sufficient after verdict. It was there said, in substance, that it is common knowledge that public lands, like post office sites, military reservations, and the like, are not within the ordinary meaning of public lands of the United States and are not subject to entry or sale for any purpose, and therefore they are never understood to be in contemplation when speaking of entries of lands for homestead purposes; that in respect of lands bearing mineral, though nonapplicable to homestead entry, persons may nevertheless compass a fraud upon the government by obtaining possession of them under fraudulent affidavits.

The essential requirement of the law is that the charging part of the indictment shall sufficiently advise the accused, in advance of the trial, of the nature and character of the offense he may be required to come prepared to meet. When it does this, although it may be inartificially drawn or defective in matters of form, yet, if the defendant go to trial without interposing a motion to quash or demurrer, the statute (section 1025, Rev. St. U. S. [U. S. Comp. St. 1901, p. 720]) interposes, which declares that:

"No indictment found and presented by a grand jury in any district or circuit or other court of the United States shall be deemed insufficient, nor shall the trial, judgment, or other proceeding thereon be affected by reason of any defect or imperfection in matter of form only, which shall not tend to the prejudice of the defendant."

So Mr. Justice Brewer, in Dunbar v. United States, 156 U. S. 185, 192, 15 Sup. Ct. 325, 328, 39 L. Ed. 390, said:

"While it may be true that a defendant by waiting until that time (after verdict) does not waive the objection that some substantial element of the crime is omitted, yet he does waive all objections which run to the mere form in which the various elements of the crime are stated, or the fact that the indictment is inartificially drawn. If, for instance, the description of the property does not so clearly identify it as to enable him to prepare his defense, he should raise the question by some preliminary motion, or perhaps by a demand for a bill of particulars; otherwise it may properly be assumed as against him that he is fully informed of the precise property in respect to which he is charged to have violated the law."

The defendant did not, either by motion to quash or demurrer, invite the court's attention to any defect in the indictment; but on the trial objected to the introduction of any evidence by the government because of the claimed defects. This practice is not recognized in criminal procedure. United States v. Harmon (D. C.) 45 Fed. 414.

The rigors of the ancient common law in exacting much particularization in the description of the offense of perjury and subornation of perjury have been greatly modified by sections 5396 and 5397, Rev. St. U. S. [U. S. Comp. St. 1901, p. 3655].

The allegation of the indictment as to the authority of the officer to administer the oath that "he, the said T. E. Fox, then and there being such receiver as aforesaid, and having due and competent authority to administer such oath to the said Charles S. Ely," was clearly sufficient within the provisions of the foregoing sections of the statute.

Error is assigned to the action of the trial court in admitting in evidence the affidavits of the proposed homesteaders, for the procuring of which the charge of subornation of perjury is predicated. The contention of defendant's counsel is that they were not both subscribed and sworn to before the register or receiver of the land office. They were sworn to before the proper officer, but the contention of defendant is that they were not also subscribed before him. The argument in support of this contention is that section 2290, Rev. St. U. S. only required that:

"The person applying for the benefit of the preceding section (that is the section authorizing the entry) shall, upon application to the register of the land office in which he is about to make such entry, make affidavit before the register or receiver," etc.

As this statute did not require that the affidavit should be subscribed before the register or receiver, in consequence thereof it occurred in instances that the application for entry would be signed by a party entitled to file as a homesteader upon certain representations made to him, but would be sworn to by another party presenting himself before the register or receiver. So that in prosecutions for making false affidavits identity between the party signing and the party swearing to it could not be shown.

It is claimed that to obviate this practice and abuse, on March 3, 1891 (Act March 3, 1891, c. 561, 26 Stat. 1097 [U. S. Comp. St. 1901, p. 1389]), Congress amended said section as follows:

"That any person applying to enter land under the preceding section shall first make *and subscribe* (italics the court's) before the proper officer and file in the proper land office an affidavit," etc.

The contention is that before the party was entitled to make the entry he should both make and subscribe to the affidavit before the proper officer; that the making of the subscription before the proper officer is just as essential as that he should make the oath before him; that, as the authority of the register or receiver to administer oaths is limited to matters connected with entries of public lands, they are not authorized to administer oaths for any other purpose or in any other manner; and that the certificate to the affidavit must both state that it was subscribed and sworn to before him.

The statute, however, declares:

"That if the said applicant making such affidavit or oath, swears falsely as to any material matter contained in said proofs, affidavits, or oaths, the said false swearing being willful and corrupt, he shall be deemed guilty of perjury," etc.

While it may be conceded that the purpose of Congress in so amending the statute as to require that the affidavit should be subscribed and sworn to before the officer might be for the purpose of such identification, it is rather evidential in character. The substantive offense denounced by section 5392 of the statute is that:

"Every person who, having taken an oath before a competent tribunal, officer or person, in any case in which a law of the United States authorizes an oath to be administered, that he will testify, declare, depose, or certify truly, or that any written testimony, etc., or certificate by him subscribed is true, willfully and contrary to such oath states or subscribes any material matter which he does not believe to be true, is guilty of perjury."

In other words, the corrupting act consists in taking the false oath before a competent tribunal or officer in a case in which a law of the United States authorizes an oath to be administered.

Aside from this, however, the testimony of some of the witnesses, especially that of Mr. Hall, whose affidavits were the predicate of one or more counts on which the defendant was convicted, showed that the witness both subscribed and swore to it before the register of the land office. That is sufficient in this respect to support the verdict on those particular counts.

Error is also assigned of the action of the trial court respecting the use made in evidence of the tract book kept in the land office, and the statements and explanations made by the witness Sanborn, the register of the Minot land office, touching memoranda in this book. In the trial of the case it became necessary for the government to show that the particular land in question was vacant public land, and subject to homestead entry, at the time of the presentation of the preliminary affidavit under investigation. To this end, said Sanborn, the custodian of the tract book in the office, was introduced as a witness, who made explanation respecting certain abbreviated entries therein. Objection was interposed by defendant's counsel against the admission of the book itself, on the ground that it was an unauthorized book, that the entries therein were unintelligible; and objected especially to a notation on some of the tracts to the effect that the entry thereof was under investigation. As the latter matter was withdrawn by the government it need not be considered.

Section 2295, Rev. St. U. S. [U. S. Comp. St. 1901, p. 1398], declares that:

"The register of the land office shall note all applications under the provisions of this chapter, on the tract books and plats of his office, and keep a register of all such entries, and make return thereof to the general land office, together with the proof upon which they have been founded."

The tract book in question was an official register authorized by the statute, and was competent evidence for the purpose for which it was introduced. The notations were in abbreviated form, and the register explained their import. For example, certain portions of a section which had been entered or the entry canceled were indicated by the words and figures "SE.⁴" and "SW⁴," and the like, which he stated meant the southeast quarter or the southwest quarter of the section. The objection to this was that the book, if regarded as a record, must speak for itself. While some courts have held that under special statutes in respect of the assessment and sale of lands for taxes such abbreviations are insufficient, we are of opinion that the common use of such abbreviations on books like those kept in the land offices warranted the court in saying that the knowledge of their import is so universal among the people as not to have required any explanatory testimony, aliunde the record. Some of these abbreviated notations on the face of the books consisted of the letters "F. C.," which the register testified indicated that the final certificates had been issued on the entry; the abbreviation "H. E." meant homestead entry; "S. D. S." meant Soldier's Declaratory Statement; the word "Can." meant canceled entry; "rel." meant relinquished entry.

The statute only requires that the register shall "note" on the tract book applications, and keep a register of such entries. The form and size of such tract book, as every person knows who has had occasion to visit the land office, make it quite impossible that the limited space allotted to each subdivision of land should admit of the notations indicating the history of the acts done respecting the given quarter section being written out in full. Immemorial usage in this respect, so well known to the public, warrants the method. The notations made by the officer are not muniments of title, but merely an indication to him as to the status of the land on his tract book. If, therefore, the necessary abbreviation expressed to the clear understanding of the keeper of the book what that status is, no sensible reason occurs why the register may not by parol explain what the abbreviated notations stood for. In other words, the only purpose of this testimony being to show whether or not the given tract of land was subject to entry when the application to file was made, it is competent for the custodian of the book, familiar therewith, to state that the notations showed the land was open to entry. Furthermore, after the defendant had investigated, as the evidence tends to show, the condition of the land and procured the affiants to make application therefor, as subject to homestead entry, and the entry was so made, it hardly lies in his mouth on trial for procuring false affidavits to gainsay the purport of the words noted on the tract book which were there at the time of the entry. He could not possibly have been prejudiced by the evidence, because he

understood when the entry was made that the lands were subject to entry as and for a homestead.

We are now brought in this discussion to consider questions respecting the action of the court in excluding and admitting certain testimony. It is to be kept in mind throughout this investigation that there was involved under each count of the indictment two pivotal issues. There must have been perjury committed by the designated affiant and the procuring of the affidavit by the defendant. An indispensable element of the first postulate is that the imputed false statement by the affiant must have been willfully and corruptly made; and in the second instance the defendant must have procured the making thereof with knowledge of the fact that the affiant was swearing falsely.

The contention of the defendant, inter alia, is that up to and including the time of the making of the filing affidavits the defendant understood, and so the affiants were given by him to understand, that the construction placed by the land office department on the homestead laws in respect of soldiers and widows of soldiers, such as the entrymen in question, was that they were not required to make actual settlement upon and cultivate in person the land to entitle them to make final proof and obtain a patent; that it was permissible for the defendant to furnish them the money to make such entry and the improvements thereon; and that they might thereafter, at their option, deed him the land at a given price plus the money so advanced by him. Quite different is the crime of perjury as applied to such situation from the instance of a conspiracy to fraudulently obtain the use and title to public lands under simulated homestead entries. In the case at bar the crucial question is the willful, corrupt swearing of the applicant, and the procurement thereto by the defendant with guilty knowledge of the false statement.

To support his contention, in part, the defendant offered in evidence what is known as Exhibit A in the record, designated "Instructions. Department of the Interior. General Land Office. Washington D. C., July 7, 1904. Registers and Receivers, U. S. Land Offices"—which is as follows:

"Sirs: The Department held December 7, 1903, in the Anna Bowes case (32 Land Dec. Dep. Int. 331) as follows:

" 'The widow or minor children of a deceased soldier or sailor, making homestead entry under section 2307 of the Revised Statutes [U. S. Comp. St. 1901, p. 1417], must comply with the requirements of the homestead laws as to residence and cultivation to the same extent as a soldier or sailor making entry under section 2304.

" 'The right to make entry under section 2307 is not transferable, and any contract entered into either before or after entry, which contemplates the sale thereof, is in violation of law.

" 'Directions given that all persons having uncompleted homestead entries made under section 2307 be immediately notified, by registered letter to the last known address of the party making the entry, as shown by the records of the land office, that if they desire to retain such entries they will be required to begin actual residence upon the land within six months from the issuance of such notice, or, if they so elect, they will be permitted to relinquish their entries, without prejudice to their homestead rights, by giving notice of such election within the same time.'

"(1) You are therefore directed to at once notify, by registered letter addressed to the last known address of the entryman as shown by your office

records, each person having an uncompleted homestead entry made under section 2307 of the Revised Statutes:

"(a) That he is required under his existing entry to comply with the requirements of the homestead law as to residence and cultivation to the same extent as is required of a soldier or sailor making entry under section 2304 of the Revised Statutes: 'that is, for such period as, when added to the military or naval service relied upon, shall equal the required period of five years, with this exception, that where a soldier, whose service is depended upon, died during his term of enlistment, the whole term of his enlistment will be credited upon the period of residence and cultivation required under the homestead laws.

"(b) That the right to make homestead entry under section 2307 of the Revised Statutes is not transferable, and that any contract entered into, prior to the completion of final entry, which contemplates the sale of the land, is in violation of law.

"(c) That under departmental ruling he is allowed six months from date of your letter of notification within which to begin actual residence upon the land heretofore entered, and that should he fail to begin such residence prior to the expiration of such period of six months and thereafter maintain same, his entry will be subject to contest and cancellation for abandonment.

"(d) That should he so elect he will be permitted to relinquish his existing entry without prejudice to his right to make another, provided he shall file in your office, within the above-mentioned period of six months, a relinquishment of all right, title, and interest under his existing entry.

"(2) Upon the filing in your office of such a relinquishment you will immediately cancel the entry and hold the land formerly covered by such entry subject to disposal as in other cases made and provided for.

"(3) Until the expiration of the period of six months no existing entry under section 2307 of the Revised Statutes will be subject to contest upon the ground of abandonment.

"(4) At the expiration of said period of six months you will report each case separately to this office with proof of service of notice as above required upon the entryman, for filing with the papers relating to such case and for such further action as the facts of the case may warrant."

To the admission of this circular the district attorney objected for incompetency, irrelevancy, and immateriality. In that connection he offered:

"To admit upon the record that formerly the opinion prevailed in the local office at Minot, as testified to by some of the witnesses, that residence was unnecessary on the part of widows of soldiers entering lands under the homestead law, and that on July 7th instructions were received from the General Land Office correcting that impression and reversing it, and instructing the local land office to notify all such entrymen to establish a residence within six months, and that such notices were sent out by the local land office to each of the entries of that character involved in this case. Beyond that, we object to the introduction of this exhibit for the reasons stated, and that its contents are hearsay and not admissible under any of the issues involved here."

The court said:

"I think there is matter in this exhibit which would be highly prejudicial if it was received, and, in view of the admission which the government has made, the objection is sustained."

We are inclined to the opinion that this letter of instructions from the land office department was of the nature of a regulatory rule of the Interior Department, under the immediate control of the Commissioner of the General Land Office. Mr. Justice Brewer, in Caha v. United States, 152 U. S. 221, 222, 14 Sup. Ct. 513, 517, 38 L. Ed.

415, speaking of rules and regulations prescribed by the Interior De-
partment not having been formally offered in evidence, said:

"We are of opinion that there was no necessity for a formal introduction
in evidence of such rules and regulations. They are matters of which courts
of the United States take judicial notice. Questions of a kindred nature have
been frequently presented, and it may be laid down as a general rule, de-
ducible from the cases, that wherever, by the express language of an act of
Congress, power is intrusted to either of the principal departments of govern-
ment to prescribe rules and regulations for the transaction of business in
which the public is interested, and in respect to which they have a right to
participate, and by which they are to be controlled, the rules and regulations
prescribed in pursuance of such authority become a mass of that body of pub-
lic records of which the courts take judicial notice"—citing a number of au-
thorities.

Section 453, Rev. St. U. S. [U. S. Comp. St. 1901, p. 257], provides
that:

"The commissioner of the general land office shall perform, under the di-
rection of the Secretary of the Interior, all executive duties appertaining to
the surveying and sale of the public lands of the United States, or in any
wise respecting such public lands, and, also, such as relate to private claims
of land, and the issuing of patents for all grants of land under the authority
of the government."

Section 2478, Rev. St. U. S. [U. S. Comp. St. 1901, p. 1586], de-
clares that:

"The commissioner of the general land office, under the direction of the
Secretary of the Interior, is authorized to enforce and carry into execution,
by appropriate regulations, every part of the provisions of this title not other-
wise specially provided for."

The document in question was a pronouncement by the General
Land Office Department establishing a permanent regulation respect-
ing entries of the public lands pertinent to the entries in question.
It is observable that in the statement of Mr. Justice Brewer, supra, he
did not say that such a regulation from the department could not
formally be introduced in evidence, but that even without such formal
presentation the court should take judicial notice thereof. How was
the defendant to obtain the benefit of this regulation if it were not
placed before the jury? The only way he could get a ruling on its
legal effect and competency was to present it to the court as a matter
of evidence to go to the jury. The court did not exclude it on the
ground that it need not be formally offered in evidence as the court
would take judicial cognizance thereof and in its admission or its di-
rection to the jury define and limit its effect; but it was excluded
because the district attorney consented that it might go upon record,
as an admission that formerly the opinion prevailed in the local office
at Minot, etc., thus undertaking to limit the language and purport of
the regulation by his own interpretation. The court having thus
barred it from the consideration of the jury for any purpose, after it
was pressed for consideration, it was neither respectful nor necessary
for defendant's counsel to urge it in other manner to secure the benefit
of the exception taken to the court's ruling. Long-Bell Lumber Com-
pany v. Stump, 86 Fed. 583, 30 C. C. A. 260; Glover v. United States,
147 Fed. 431, 77 C. C. A. 450. The defendant was entitled to have the

jury consider the whole regulation and determine whether or not it was an implied admission by the department of government intrusted with the matter of regulating such entries of the public lands that hitherto, up to the ruling in the Anna Bowes Case, actual settlement and cultivation upon such lands by soldiers and soldiers' widows were not required. It tended to confirm the testimony of the defendant of his understanding of the practice in that respect, and bore directly upon the essential issue of criminal intent.

In all fairness to the defendant, as a corroborating fact of his claimed understanding of the practice aforesaid, this should have been admitted on the sharp conflict between his testimony and that of the witness J. R. Hall. The government was indulged to go back more than three years prior to the finding of the indictment to inquire of said Hall respecting a verbal arrangement between him and the defendant for entering the land in the Minot district, who detailed a conversation claimed to have been had with the defendant about his entry; that he was conscious of committing perjury when he swore to his application; and that he did it in carrying out his understanding with the defendant, to the effect that in consideration of the sum of $200 he was to convey this land to the defendant on making final proof, which the defendant denied; and, further, that he (Hall) did not make actual settlement and improvement thereon. It would be a corroborative circumstance for the defendant to show that it was the common understanding, acquiesced in by the land office department up to that time, that no such actual settlement and cultivation by the entrymen were required; and most certainly it bore upon the question as to whether or not the defendant in that respect was guilty of subornation of perjury in Hall's case.

There are many assignments of error respecting the action of the court in allowing certain questions asked by the prosecution and the disallowance of questions on the part of the defendant. We will only consider such of these errors as are deemed representative.

Mrs. Arnold was one of the persons charged to have made a false affidavit by the procurement of the defendant. She was introduced as a witness by the government, and was by no means an unwilling witness. To show the defendant's conscious sense of irregularity in his action in this matter, this witness testified respecting a conversation had with the defendant after she was advised that the later ruling of the land office department required that she make an actual settlement and cultivation of her homestead, and after she moved on to it. She testified that, after she received a letter from the land office saying it was unlawful for her to take up land under a contract, she saw the defendant in January and February, 1905, when she had a conversation with reference to the land; "and he told me that the law was changed, that I would have to go and prove up the land. I asked him if it was worth proving up, and he said 'Yes,' it was a better piece of land than he thought it was when he took it up, and also said that when it was proved up it would be worth a thousand dollars. When I came back I often saw and spoke to Mr. Nurnberger; that is when I came back to live on the land. I had no conversation in particular that I remember of with Mr. Nurnberger on the subject of this contract that

I made with him." Whereat, the district attorney asked the following question:

"Well, give us the general conversation you had with him then."

To which the defendant interposed objection that it was incompetent because relating to a matter occurring subsequent to the matters alleged in the indictment counting on this entry, and the intent of the defendant not being an essential element, etc. The objection was overruled. The witness answered:

"Why, he spoke about some one getting him in trouble. * * * I have had no conversation with Nurnberger since I came to Fargo, but have talked with him on different things, but not on this since I came to Fargo here as a witness. He told me to tell the truth."

Her answer was not satisfactory to the prosecution, and thereupon the district attorney asked the following question:

"I want to refresh your recollection. Do you remember Mr. Nurnberger saying to you since you came to Fargo that if it were not for his sons that he would let the trial go. and that he told you, 'I said to my sons to get out of the blamed state and let it go?'"

This was objected to as leading and cross-examination of the government's witness. The objection was overruled. The witness answered:

"Why, he said something but I don't remember: I can't remember just what he said."
"Q. State whether or not that was the substance of it."

Objection was again interposed on the ground that it called for a conclusion of the witness. This objection was overruled. The witness answered:

"Yes. I can't repeat the words he said. It was something like that, but I can't remember the words he said. I think it was to that effect."

It must be confessed that this was most obnoxious to the objection of a leading examination of the prosecution's own witness. It not only suggested the matter desired, but put words in the mouth of the witness who could then only say "it was something like that." The government, however, got the full force of the words suggested by the prosecutor.

The same offense was repeated in other instances; strikingly so in the case of Hall, the affiant named in the tenth count of the indictment, on which a conviction was had. He had no written contract with the defendant respecting the land, and testified about conversations he had with the defendant in 1902 respecting the entry. He admitted that he was conscious in making the affidavit that he was swearing to what was not right, that he did not intend to comply with the homestead law in making settlement, cultivation, etc., and that he did not file in good faith. Thereat the district attorney asked the following question:

"Wasn't it the facts under which you came out there and the purposes for which you came out there?"

This was objected to on the ground that it was leading and suggestive. The objection being overruled, the witness answered:

"Yes, sir. I knew at that time about my arrangement with Mr. Nurnberger. There was no other fact or circumstance with reference to my coming out to North Dakota to take up lands which affected my rights in any way to my knowledge except my arrangements with Mr. Nurnberger."

"Q. Any impression that you had that the transaction was wrong, was it based on anything else than your arrangement with Mr. Nurnberger? That is, was that all or was there more?"

This was objected to on the ground that it was leading, suggestive, and argumentative. The objection was overruled, and the witness answered:

"Well, I couldn't take the oath without doing wrong; that is the way I took it. I couldn't fulfill my contract without doing something that I thought was not right."

In the examination of Mrs. Lowell, one of the affiants counted on in the indictment, the prosecution being concerned to show that she made the affidavit reciting that she applied to enter the land for a homestead, not to inure to the benefit of another, and that she was induced thereto by the defendant, the following questions were asked:

"Q. State whether or not the manner in which the business was done and the extent to which it was done by Mr. Nurnberger had anything to do with making you believe that it was proper and lawful?"

Objection thereto being overruled, she answered:

"He didn't say anything about it, whether it was or not."

This being unsatisfactory to the prosecution, it was followed up with the further question:

"What I want to get at is this: State whether or not you was led to believe and did believe that the transaction was proper because it was done openly by so many people there at that time, whether that had anything to do with it."

Objection to this was overruled, and she answered:

"Yes, sir; when the affidavit was read over to me by the lawyer, I heard him say 'that my said application is honestly and in good faith made for the purpose of actual settlement and cultivation and not for the benefit of any other person, persons, or corporation,' but I didn't understand that way. I also heard the lawyer read, 'and that I will faithfully and honestly endeavor to comply with all the requirements of the law as to settlement, residence and cultivation necessary to acquire title to the land applied for,' and 'that I am not acting as agent for any person, corporation or syndicate to give them the benefit of the land entered or any part thereof or of the timber thereon.' and 'that I do not apply to enter the same for the purpose of speculation but in good faith,' etc. But I don't remember him reading 'and that I have not directly or indirectly made and will not make any agreement or contract in any way or manner, with any person, or persons, corporation, etc., by which the title I might acquire from the government should inure in whole or in part to the benefit of any person except myself.'"

Finney is another entryman counted on in the indictment. He had a written agreement with the defendant respecting the arrangement between them. He was a witness for the government. The district at-

torney, over the objection of the defendant, was permitted to interrogate him as follows:

"What was the agreement between you and Nurnberger, just state it all?"

This was objected to, inter alia, that as the agreement was in writing it spoke for itself, and if verbal the proper way to show what it was was to state the terms thereof. Then the district attorney asked:

"State whether or not you made the trip to North Dakota and filed on the land to carry out your agreement with Nurnberger."

He answered:

"Well, that was about the size of it."

When the defendant was on the witness stand he was asked by his counsel:

"You may state if at any time you made a contract with anybody to locate them on lands under the terms of which you were to have the land at all events when he proved up."

The court sustained objection to this. He was further asked by his counsel:

"State what the terms and conditions of your agreement were when you located her (meaning Mrs. Arnold)."

Remarkably enough, in view of rulings by the court on like objections interposed by the defendant's counsel, the objection to the above question was sustained on the ground that it "called for a conclusion and not a conversation and documents."

The general rule undoubtedly is to leave the propriety of leading questions to the sound discretion of the trial court, the exercise of which is not ordinarily ground of error. The application of the rule obtains where the witness is apparently unwilling, or unfriendly to the questioner, or where the party has been misled by previous assurances to counsel. It must, however, be conceded that the abuse of such discretion would have no corrective if it were rigidly maintained that it is not reviewable. The repeated indulgence to the prosecutor in putting leading questions, and in form to suggest the answer, and calling for the mere conclusion of the witness, was manifestly unfair and prejudicial to the defendant. Many of these witnesses were not unfriendly to the prosecution, or displayed any reluctance to aid it. After the ruling of the land office department, indicated by said Exhibit A, there was some flurry among these entrymen, from apprehension of exposure to a prosecution for perjury. They were visited by an inspector. Some of them voluntarily placed in his hands the agreements between them and the defendant under which he undertook to find the lands. The witnesses, Arnold and Hall, most certainly needed no suggested testimony, or to have put in their mouths words to express it.

It were but affectation to pretend that these witnesses did not testify under the conscious sense that probably they would more certainly secure immunity for themselves by contributing freely to the conviction of the defendant. And in view of the stress under which the affiants testified it was hardly charitable to press them for an answer to

words framed by the prosecution when a failure to respond to his liking might, in their minds, endanger their desired immunity.

Words are at times especially significant. If counsel are permitted to so frame a question put to their own witness as to suggest the answer desired, there is always imminent danger of getting before the jury the phrases and ideas not really those of the witness.

Why should not the defendant have been permitted to testify that he made no contract with any of the affiants in question whereby he was to have the land in any event? It was permissible for him to testify that he did not. so understand the arrangement he made with them. It is settled law that a party charged with the commission of a crime or the perpetration of a fraud may testify that he entertained no criminal or fraudulent intent. The very gist of the crime of perjury is made by the statute itself to depend upon the fact that the oath made should not only be false, but the falsehood must have been willfully and corruptly asserted. So if the affidavit made or procured was in ignorance of its contents, or under a misapprehension of its purpose, no matter how culpably negligent in a civil action the party might be, he could not be convicted of perjury, because the act was wanting in the required willfulness and corruption. The witness should have been permitted to answer the question as to whether or not he had ever made any claim to the land entered by Mrs. Arnold, especially in view of the fact that the district attorney, over the objection of his counsel, was permitted to show by the cross-examination of the defendant that in respect of some lands entered by some soldiers as homesteads as far back as 1900–1901, not counted on in the indictment, the defendant had obtained deeds thereto from such soldier soon after the entry, and prior to final proof. If that were permissible against the defendant to show "guilty knowledge," as ruled by the court, why was it not permissible for the defendant to state that as to the land of Mrs. Arnold, who had testified energetically against him, he had made no such claim? It is difficult to escape the impression that the court was either too indulgent to the government or too discriminating against the defendant.

Justice takes delight in according to every human being, charged with the commission of a crime, a fair and impartial trial. Prescribed rules of criminal procedure are the outgrowth of long and sane experience, buttressed by the earnest study and wisdom of jurists and lawgivers. They may be hedged about by some refinements, unjustly stigmatized by overzealous partizans as "mere technicalities," yet judicial, impartial, history attests the fact that often they constitute effective barriers against unreasoning passion and the behests of spasmodic clamor.

Complaint is made of that portion of the charge to the jury in which the court said:

"These affidavits are before you. They will go to the jury room with you. It is conceded in each case that the entrymen swore to the affidavit. That is one fact we start out with. What is the second fact? Did these affidavits contain any statement which was not true?"

The court then said, if the statements were true, that was the end of the case; if they were not true, the jury would proceed to the in-

quiry as to whether the entrymen signed the affidavits knowing that they contained those statements, or any of them, and that any such statement was not true; if they did and intentionally swore to the affidavit, they committed perjury.

The generalization of this direction was calculated to mislead the jury. It apparently, to the mind of the laymen, narrowly directed attention to the effect of the mere recitals of the affidavit. It authorized the jury to find that, if the affiant did not intend to make actual settlement on and cultivation of the land, the oath was criminal; although the affiant may have understood and believed that as applied to his or her condition and privilege, the affiant was not required to make settlement on and cultivate the land; and therefore gave no heed to such recital in the affidavit, regarding it as formal and not material. The oath, under such conditions, would not be willful and corrupt, as it would be wanting in essential criminal intent. The charge should have been so qualified in the immediate connection to avoid the danger of the jury being misled by the stress laid upon the abstract recitals.

Other errors are pressed for consideration, but they are not of sufficient importance to justify the further extension of this prolonged discussion; and the matters complained of may rectify themselves on a second trial.

The judgment of the District Court is reversed, and the case remanded, with directions to grant a new trial.

HOOK, Circuit Judge (dissenting). That the defendant was guilty was shown overwhelmingly and beyond every reasonable doubt. Indeed, the proof went to the verge of confession. The matters mentioned in the opinion, even if unexplained in the voluminous record of a long trial, which I think is not the case, contributed nothing to an unjust result. The contention of counsel that the District Attorney was occasionally allowed to ask leading questions is, it seems to me, a fair illustration of the merit of the grounds relied on for reversal.