### UNITED STATES *v.* FLEMMING and another.

*(District Court, N. D. Illinois.)*

1. **USE OF THE MAILS FOR FRAUDULENT PURPOSES—NATURE OF THE OFFENSE.**
   To constitute an offense, under section 5480 of the Revised Statutes, which provides for the punishment of any person using the mails for fraudulent purposes, it is not necessary that the guilty person should be the originator of the fraudulent scheme in which he participates.

2. **SAME—DEPOSITING LETTER.**
   Under that section a person is guilty of "placing a letter in the post-office" if a letter has been so deposited by his direction, even though by the hand of another.

3. **SAME—FRAUD—PARTICIPATION BY AGENT.**
   A clerk who knowingly assists in the fraudulent practices of his principal is as much a party to the fraud as the principal himself.          •

4. **SAME—EVIDENCE—SIMILAR, BUT UNCONNECTED, TRANSACTIONS—PROOF OF INTENT.**
   Upon an issue of fraudulent intent in any transaction, evidence of similar transactions at a previous time is relevant, so far as it goes to prove the intent, though for no other purpose. Accordingly, upon an indictment for the use of the mails in furtherance of a fraudulent scheme connected with a so-called "Fund W," *held,* that evidence of fraudulent practices by the same parties, by means of certain funds, "H" and "K," was admissible.

5. **SAME—FAILURE TO PRODUCE EVIDENCE—INFERENCES.**
   The neglect of a party to produce books which would show the character of his transactions, warrants an inference that such evidence would be damaging.

6. **SAME—TESTIMONY OF ACCOMPLICE**
   The testimony of an accomplice, though it should be corroborated if possible, is to be considered by the jury, even though uncorroborated, for what it is worth.

*J. H. Leake,* Dist. Atty., for the United States.
*W. C. Gondy* and *E. A. Storrs,* for defendant.

BLODGETT, J., *(charging jury.)* The indictment in this case is based upon section 5480 of the Revised Statutes, which I will now read:

"If any person having devised, or intending to devise, any scheme or artifice to defraud, to be effected by either opening, or intending to open, correspondence or communication with any other person, whether resident within or outside of the United States, by means of the post-office establishment of the United States, or by inciting such other person to open communication with the person so devising or intending, shall, in and for executing such scheme or artifice, or attempting to do so, place any letter or packet in any post-office in the United States, or take or receive any therefrom, such person so misusing the post-office establishment shall be punished," etc.

The object of this statute was to prevent the use of the post-office establishment for fraudulent purposes. The postal system may well be considered as one of the most useful devices of our modern civilization, organized and supported at the public expense. It furnishes so cheap, expeditious, and certain a method of communication between persons in different parts of the country, and, by means of postal-treaties, in foreign countries, that the temptation to use it for the promotion of fraudulent schemes is very great. And, hence, con-

gress has deemed it wise to enact the statute I have just read, in order, if possible, to prevent what is intended to be, and is, one of the beneficent agencies of the age, from being converted by bad men into an instrumentality for the perpetration of crime. To make out an offense under the law, three matters of fact must be charged in the indictment, and established by the proof: (1) That a scheme or artifice to defraud has been devised by the defendants; (2) that such scheme or artifice to defraud was to be effected by correspondence with another person, by means of the post-office establishment of the United States, or by inciting such other person to open communication with defendants. It need not be shown that the use of the post-office was to be the sole means of effecting the fraud, but it must appear that the post-office was to be used as one of the instrumentalities to that end; (3) that for the purpose of executing such scheme or artifice, or attempting so to do, the defendant has placed a letter or packet in any post-office of the United States, or has taken or received a letter or packet therefrom.

It is not necessary, in order to make out a case under the law, that the defendant shall be the inventor or originator of the scheme or artifice to defraud, as such scheme may be as old as falsehood. But if a person uses or attempts to use an old scheme or device for purposes of fraud by means of the mails, he is as clearly within the scope of this law as if he was the first to have conceived or thought of such scheme. To confine the operation of this statute to new schemes, only the actual product of the mind of the defendants, and not before conceived or used, would be too narrow a construction of the purposes of the act, and would allow old frauds the use of postal facilities denied to new ones. So that one arraigned for an offense under this act would only be required to show that the fraud was old, or not the product of his own brain, to secure his acquittal. This cannot be allowed. If a man adopts some old scheme which another devised, and acts upon it, he has made it his own for the purposes of this act. It is also not necessary to show, in order to make out this offense, that the defendants actually, with their own hands, placed a letter or packet in a post-office. If it appears from the proof that it was done through their agency or direction, by an employe or agent of the defendants, employed and directed for that purpose, it is enough.

The indictment in this case contains 10 counts. The first, second, seventh, and eighth, sufficiently, in my estimation, charge an offense under this statute. The third, fourth, fifth, sixth, ninth, and tenth counts, in my estimation, are not sufficient to make out an offense under the statute, and before you leave your seats, and at this time, for that matter, you may be considered as rendering a verdict of not guilty, by direction of the court, upon the third, fourth, fifth, sixth, ninth, and tenth counts. This will leave only the first, second, seventh, and eighth counts to be considered under the proofs.

The first count charges "that Flemming and Loring, pretending to be

commission merchants at Chicago, and to be managers of an association or fund by them pretended to exist under the designation of Flemming & Merriam's "Fund W," for speculating and trading in grain, provisions, and stock, had devised a scheme and artifice to induce the sending and intrusting of moneys to them by divers other persons, for the investment and employment thereof, for those persons respectively, in such pretended association or fund, *and the same moneys fraudulently to convert to the own use of them, the said Flemming and Loring, and thereby to defraud the said persons who should so send and intrust the same to them,* which scheme was to be effected by opening correspondence with such persons by means of the post-office establishment of the United States, and by inciting such persons to open communication with them, the said Loring and Flemming, under the firm name of Flemming & Merriam. And that for the purpose of executing such scheme, defendants did place in the post-office at Chicago, ten letters and ten packets directed to divers persons, to the jurors unknown." The second count is substantially the same as the first, except that it charges that defendants, in execution of said scheme and artifice of fraud, took and received from the post-office at Chicago, 10 letters and 10 packets directed to Flemming & Merriam. The seventh count is substantially like the first, except that it charges that defendants placed in the post-office at Chicago a certain letter and packet directed to Lydia Remington, North La Crosse, Wisconsin. And the eighth count charges that defendants took and received from the Chicago post-office a letter from Lydia Remington to Flemming & Merriam.

The gist of the fraud charged in these four counts of the indictment is the purpose of the defendants to convert to their own use the moneys which they should induce and procure persons to send them, to be used as a part of the alleged "Fund W" in speculating in grain, provisions, and stocks. It is not necessary that it should be proven that there was no such firm as Flemming & Merriam, nor that there was no "Fund W." But the essential element of the charge in the indictment is the fraudulent intent of defendants to convert to their own use the moneys which they should induce persons to send them for investment as "Fund W," or a part of it. Nor is it necessary that it should appear in the proof that defendants intended to convert to their own use *all* the moneys so obtained. If it was their purpose to convert any part of the moneys to their own use which persons were to be induced to send them for investment and employment in "Fund W," then the offense is committed.

I understood defendants' attorneys, in their argument to you, to admit that the allegations of mailing and taking from the mail by defendants of letters and packets is substantially proven. That is, there is no dispute but what defendants mailed, or received by mail, letters and circulars in execution of their scheme to induce persons to invest in the Flemming & Merriam "Fund W."

The real controversy in the case is as to the character of the dealings of defendants with the money sent them by divers persons to be used under the name or description of "Fund W." Did the defendants induce, or attempt to induce, persons to send them money under pretense that it was to be used in speculating in grain, provisions, and stocks, with the intent to convert such money to their own use?

It is not my purpose to recapitulate in detail the testimony in the case, as the same has been quite exhaustively discussed before you by counsel. It is enough to say that the government has called Rheiniman, of Reidsburg, Wisconsin; Crammond, of Eureka, Illinois; Schaeffer, of Eureka, Illinois; Mrs. Remington, North La Crosse, Wisconsin; Loudermilch, of Auburn, Illinois; Benford, of Washington, Illinois; Gibson, Rockford, Illinois,—all of whom testified that during the summer and fall of 1882, and some in December, 1882, and January, 1883, they had received circulars by mail, purporting to come from Flemming & Merriam, inviting them to invest or take shares in "Fund W;" that they respectively sent money to be so invested, and received by mail certificates purporting to be issued by Flemming & Merriam for shares in "Fund W," and afterwards also received by mail, letters, statements, and other circulars relating to "Fund W." These witnesses also gave testimony tending to show that they received dividends substantially as promised by the circulars for some time after they took their respective shares.

The testimony for the government also tends to prove, and it is not contradicted by defendants, and may be taken as a conceded fact in the case, that about the twenty-eighth of January, 1883, in pursuance of orders of the postmaster general, the further delivery of registered letters and payment of money orders to Flemming & Merriam was stopped. And that the business of "Fund W" stopped very shortly afterwards, substantially by the thirty-first of January, or first of February. And government proof tends to show that no money was paid to shareholders, either in the form of principal or dividends, after such stoppage. Proof has also been given on the part of the prosecution tending to show that the dividends declared and paid to their shareholders were not the result of actual transactions or speculations, but that they were paid from moneys received from later subscribers to the "fund,"—that is, that those who subscribed early to the fund were paid dividends out of moneys coming into the hands of Flemming & Merriam from later subscribers; that no actual dealings in grain, provisions, or stocks were made by defendants for the benefit of the fund, but that for the purpose of making a show of apparent losses, fictitious accounts were made of pretended dealings between Flemming & Merriam and the Public Produce, Grain & Stock Exchange and the Metropolitan Grain & Stock Exchange, and others engaged in business similar to that of these exchanges, so as to pretend that "Fund W" was all lost, or all of it

which belonged to the shareholders, in unfortunate operations with these exchanges, at or about the time the delivery of registered letters and payment of money orders by the post-office was stopped. Proof has also been given tending to show that defendants, Flemming and Loring, had, before the "Fund W" scheme was started, been engaged in two other schemes of similar character, known as "Fund H" and "Fund K," which "funds" were both lost. You will bear in mind that defendants have been indicted and are on trial before you only for the mailing and receiving of letters in execution of the alleged fraud known as "Fund W." The testimony in regard to "Funds H and K" is only admitted for the purpose of showing, so far as it tends to show, a fraudulent intent on the part of defendants in procuring money for "Fund W." Fraud can rarely be proven by direct testimony. Its ways are devious and concealed, usually so specious and ostensibly fair as to disarm all suspicion until the mischief is done. Very few frauds could be perpetrated if the victims were notified in advance of the intent of the perpetrator. And in most cases, where fraud is the main issue, the material question is to prove a fraudulent intent in regard to matters which, upon their face, at the time of the transaction, seem to bear the stamp of upright dealing, but beneath which lurked a dishonest purpose. It is, therefore, as a rule, very difficult, if not impossible, to show fraudulent intent except by circumstances or a disclosure of the surrounding facts, which often, in the light of subsequent events, show a fraudulent intent from the inception of a transaction, that fraud was the leading motive and incentive. Courts, therefore, as a rule, allow a wide range of testimony where fraud is the main issue in a case. I cannot more readily state the law to you on this branch of the case than by reading from a couple of cases decided by the supreme court of the United States.

In *Castle* v. *Bullard*, 23 How. 187, the court, by Justice CLIFFORD, said:

"Experience shows that positive proof of fraudulent acts is not generally to be expected, and for that reason, among others, the law allows a resort to circumstances as the means of ascertaining the truth. 'Great latitude,' says Mr. Starkie, 'is justly allowed by the law to the reception of indirect or circumstantial evidence, the aid of which is constantly required, not merely for the purpose of remedying the want of direct evidence, but of supplying an invaluable protection against imposition.' Whenever the necessity arises for a resort to circumstantial evidence, either from the nature of the inquiry or the failure of direct proof, objections to testimony on the ground of irrelevancy are not favored, for the reason that the force and effect of circumstantial facts usually and almost necessarily depend upon their connection with each other. Circumstances altogether inconclusive, if separately considered, may by their number and joint operation, especially when corroborated by moral coincidences, be sufficient to constitute conclusive proof."

So, also, in *Lincoln* v. *Claflin*, 7 Wall, 138:

"Where fraud in the purchase or sale of property is in issue, evidence of other frauds of like character committed by the same parties, at or near the same time, is admissible. Its admissibility is placed on the ground that where

transactions of a similar character, executed by the same parties, are closely connected in time, the inference is reasonable that they proceed from the same motive. The principle is asserted in *Cary* v. *Hotailing*, 1 Hill, 317, and is sustained by numerous authorities. The case of fraud, as there stated, is among the few exceptions to the general rule that other offenses of the accused are not relevant to establish the main charge."

The testimony in regard to the dealings of these defendants with "Funds H and K" is therefore before you, and to be considered by you so far, and only so far, as it tends to show a fraudulent intent of defendants in procuring money to be sent them for shares in "Fund W." Does the testimony as to the dealings of defendants with "Funds H and K," and the outcome of these funds, throw any light upon the purposes of defendants in soliciting money for shares in "Fund W?" So far, and only so far, need you consider this branch of the case. Does the fact that all these funds were manipulated by substantially the same managers and the same methods, the same class of circulars and statements, the same kind of correspondence and promises, and that these funds came to substantially the same end; that "Fund K" was started and put before the public just before "Fund H" was said to have failed, and that "Fund W" appeared before the public just before "Fund K" was reported to have failed,—do these facts, when taken together, satisfy you that all these schemes were fraudulent; that "Fund K" and "Fund H" were fraudulent devices to defraud the persons who might be induced to send money for investment in them, and that, therefore, this fund was started for the same purpose, carried on to the same end, by substantially the same managers? This is the only light in which you are to consider this testimony. Does it throw any light upon the purposes of these defendants in the manipulation and presentation to the public of "Fund W?" The substance of the proof on the part of the government then tends to show that the defendants used the "Fund W" scheme as a mere pretense to obtain money from the shareholders, intending to convert this money, or some part of it, to their own use. There is much proof on the part of the government as to the manner in which these funds were handled and lost which it is proper for you to consider, as tending to prove that in devising or operating these schemes, the defendants were actuated by fraudulent purposes. You are to consider all this proof together.

On the part of the defense, it is claimed, (1) as to defendant Loring, that he was not a member of the firm of Flemming & Merriam, but was only a clerk for them and employed upon a salary; (2) that the "Fund W" was in good faith invested in the purchase or sale of grain, provisions, and stocks, or, at least, invested in what are called speculations in grain, provisions, and stocks, mostly, as I remember the proof, in what is known as the Public Produce, Grain & Stock Exchange and the Metropolitan Grain & Stock Exchange, and was lost in due and regular course of business with those exchanges.

As to the first point, in regard to defendant Loring, there is proof

on the part of the prosecution tending to show that he was the chief manager of the business of Flemming & Merriam; that he nego- tiated the lease of the office, ordered the printing of circulars, made the contracts for advertising, and did most of, if not all, the trading, signed checks, contracts, and certificates, and claims a large interest in this fund, and there is also proof tending to show that he claimed to have originated the circular through which these funds were substantially presented to the public. A man may do all that the proof shows Loring to have done in connection with the business of a firm, and yet be only an employe. That is, the firm might clothe him with power to do all that the proof shows he did do. So, too, a man may, for the purposes of fraud, transact business in the name of another, or of a fictitious person or fictitious firm. The essential question for the purposes of this case is, who was manipulating this scheme of "Fund W?" If defendant Loring was one of its managers, devisers, or operators, knowing it to be a fraud, operating upon it as such, if it was carried on by him and under his direction, then he is as guilty as if his name appeared upon the face of the firm as one of its active operating members. If he, knowing it to be a fraud, took the management of, or an active part in, this business, then he is liable, no matter under whose name it was carried on. Who did manage this scheme? Who put it before the subscribers of this fund? Who took charge of the money? By whose artifice or scheme was it lost, if by any one's artifice and scheme? Who planned and helped to plan, or co-operated in the planning, understandingly and intelligently, the scheme, if a scheme was put in operation, for the purpose of converting this money to the use of these defendants, or either of them? If a clerk in the employ of a principal knowingly engages in the fraudulent act of his principal, he is as much a party to the fraud as the principal himself. Many men conduct fraudulent schemes and use their clerks and agents as tools without the clerks knowing the purpose of the principal in the scheme, and therefore the clerk is not guilty, because he does not know the ultimate purpose of his employer. But if the clerk knows the purpose of his employer from the outset, or at any time before the fraud is consummated, and co-operates in it, he is as guilty as the principal. And it is no defense for Loring that Waters was not also indicted as one of the parties to this fraud with him, although the proof may satisfy you that Waters was as active a participant in the scheme as Loring. The grand jury, at the time they found this bill, may not have known all the facts which have been disclosed upon this trial, and may not, therefore, have known the part that Waters took in the scheme, if there was a scheme to defraud; therefore, the fact that Waters is not indicted is no defense to Loring. The question, after all, is, was he an intelligent operator in a scheme of fraud, along with Flemming, or did he manage Flemming in the scheme itself?

As to the second point, that the money invested in this "Fund W" was all lost in dealing in grain, provisions, and stocks in these exchanges, as I have already said, the government contends that there were no such *bona fide* losses; that pretended or fictitious losses have been reported for the purpose of accounting for the loss of the fund, but that in fact the money belonging to this fund has been converted to the use of the defendants, or made away with for their own purposes. If the proof satisfies you that this "Fund W" has been lost by dealing in good faith in grain, provisions, and stocks, then the allegations as to the fraudulent character of this "Fund W" scheme are not sustained. The scheme as represented in the circulars contemplated the investment of this money in speculations of this character, and a loss of even the whole investment is a possible, and perhaps probable, contingency of such investment. The defendants, or Flemming & Merriam, were employed by these shareholders to speculate for their benefit. The question is did they deal in grain, stocks, and provisions, in good faith for the benefit of their shareholders, and has the money in question been lost in that way? This you must decide by the evidence in the case, and this is the turning or pivotal point in the case, as you must already have seen. There is proof in the case as to the methods of dealing in those exchanges where it is claimed that most, if not all, this money was lost. You will see from what the proof discloses in regard to the methods of these concerns that there is, to say the least, ample opportunity in their methods for making up a fictitious or fraudulent account, if it is desirable for the purposes of the exchange, or any of its customers, to show a loss. No regular books of transactions are kept, but the transactions are kept on sheets, as they are called, and the manager of one of the exchanges, Mr. Pratt, of the Cosmopolitan, if I remember right, tells you in his testimony that he destroyed his sheets at the end of each year. But aside from this, you can see that by those methods the managers of the affairs of Flemming & Merriam, if they wished to show an apparent transaction, could readily put themselves on the wrong side of the market at any moment and purposely sink, or apparently sink, a very large sum in margins at any time. It is also true that the defendants, as managers of these funds, could only realize for themselves the benefit of these losses by some collusive arrangement with the managers of the exchange. And you are to say, from the proof, from the relations which the testimony discloses between these parties, the intimacy which existed between all or some of them, whether there was or was not such a relation between them as renders it not only probable but certain, beyond reasonable doubt, that this money was lost by arrangement between the managers of this fund, the defendants, and the managers of those exchanges. But if the proof satisfies you that the money was so apparently lost for the mere purpose of making up a record or show of losses, and went into the hands of the proprietors of these exchanges,

in order that the managers of the "fund" could realize some direct or indirect benefit from it, then you will be justified in finding the allegation of fraud in the indictment sustained by the proof. That is, if you believe from the proof that the money was not lost in *bona fide* dealings, but has been otherwise disposed of by defendants, then you will be justified in finding the fraud established; and, in passing upon this question, you may properly, as I have already said, consider the relations which defendants or either of them bear to those exchanges.

The government is required to make out its case, as to this issue of fraud, by proof so clear as to leave no resonable doubt upon your minds of the defendants' guilt. I do not mean by this that the fraud must be proven by direct testimony, but the circumstances environing the defendants' dealings with this fund must, when all considered together, stamp the transaction as unquestionably, undoubtedly fraudulent, such as leaves no other conclusion reasonable or tenable. If from the pooof you find that it was a part of the scheme or plan of defendants for defrauding these shareholders in "Fund W," that the money should in some manner, not by buying or selling commodities, such as grain, provisions, and stocks, in good faith, get into these exchanges and be held by them as apparent profit, then the allegations of fraud in the indictment are as completely sustained as if the proof showed that defendants had expended the money in the purchase of other property or still have it in their hands. You should, in the solution of this question of fraud, consider—*First*, the character of the scheme or plan as disclosed in the circular in proof. Does it bear upon its face and in its terms the evidence of an honest or a fraudulent purpose? Would honest men, knowing the risks and vicissitudes of business, promise such results as are piomised in this circular? Does your common knowledge of business and business affairs teach you that such promises could be made in good faith, and that parties making them had a right to expect that they could fulfill them? *Second.* There is proof on the part of the government tending to show that dividends, which it is alleged were declared and paid, were reported in advance,—that is, that reports of the earnings or profits of the fund were made up before the expiration of the time purporting to be covered by such reports; such as, that, at least as early as the third week in January, a report of profits for the fourth week of that month was prepared to be sent out to subscribers. You are to say whether men who do business upon actual transactions can and do make reports of that kind. *Third.* It is an admitted fact that directly after the delivery of money orders and registered letters to Flemming & Merriam were stopped, the entire fund on hand was reported to be lost, and there is testimony tending to show that no payments have been made to shareholders since that time. It is right that you should inquire, in view of this fact, what necessary connection there was between the stopping of the receipt of more money

and the loss of that which had already been put into this "Fund W." Does this proof show that there was any such decline or rise in the market; that there was any such change in prices in grain, stocks, or provisions as would necessarily sink the whole of this large sum of money then on hand in margins upon trades then pending? Some of defendants' witnesses say the call for more margins was justified by the condition of the market, but could not the defendants have shown by their books what trades they then had pending, and what margins they were bound to put up? It would seem to be but a fair inference from the facts already known or admitted that these margins were lost almost instantly after they were put up. Was there any obligation to put up further margins upon trades that were then pending, or were the trades made upon the condition that the parties only lost the margins they put up at the time the trades were made? These are pertinent facts for you to consider. Could not the defendants have made this matter clear by bringing in proof of their trades and showing what they were, what was then done, what transactions were then pending, and that they were bound by their contracts with these exchanges to put up more margins if called for? The books of Flemming & Merriam showing their transactions are not produced, nor is their loss or destruction shown. The proof tends to show that they kept books. If so, these dealings with these exchanges would or ought to have appeared or be shown by these books in some form. The fact that the books are not produced or accounted for is to be considered by you as at least tending to show that, if produced, the books would not help defendants' case. You are also to consider in this light, and as bearing upon Loring's individual participation in these transactions, the letter which he wrote to Miller, and which is in evidence in this case, and say whether a party not interested in this fund in the least would have written such a letter to Mr. Miller, and also to say whether the tone of this letter does or does not convey the idea that he is writing in confidence to a man who knows that a fraud has been perpetrated in reference to "Funds K and H." You are to consider this letter, its tenor, the manner in which it is written, as bearing upon the question of the good faith of this man in his dealings with subscribers to these funds.

I hardly need say that if the testimony of Mrs. Miller, W. W. Miller, and Charles E. Hyde is believed, then there is direct evidence tending to establish the fraudulent character of defendants' dealings with "Fund W." But defendants insist that this testimony is not worthy of belief; that Mrs. Miller's testimony, standing alone, does not prove fraud as to "Fund W;" that W. W. Miller has been impeached, and that he also stands in the attitude of an accomplice in this fraud, who has been promised immunity from some part of the punishment which may follow a conviction on an indictment now pending in this court against him. The interest of an accomplice who turns state's evidence, as it is called, is always to be considered

as affecting his credibility. You are, however, the sole judges of his credibility. While it is proper for you to look for testimony corroborating the testimony of Miller, yet if, from the tenor of his testimony, you find it so coherent, natural, and apparently truthful that it satisfies you he has told you the truth, then you have the right to convict on his testimony, even if uncorroborated. So, also, if you find his testimony so coincides with other proven or admitted facts as to make out and complete a harmonious whole; that if the other proven facts and circumstances in the case corroborate or tend to corroborate Miller's statement,—then you are also at liberty to accept his testimony on the ground that it is corroborated, or corroborated to some extent, and to your satisfaction.

Testimony has been given tending to show that both Miller and Hyde have bad reputations for truth and veracity in the community where they reside. This does not necessarily compel you to disbelieve them, because even bad men and notorious liars may tell the truth sometimes, and under some circumstances, and the question after all is, have they told you the truth in this case? In the *first* place, is their statement so consistent with other proven facts as to impress upon you a conviction of its truthfulness? *secondly*, do you find corroboration of their testimony from other witnesses, and the surrounding circumstances in evidence? As I said before, you are the sole judges of the credibility of these witnesses, and must say, in the light of all the proof in the case, whether you are satisfied they have told you the truth. You are not obliged to accept their statements, and you are not obliged to disbelieve them, but you must consider them in the light of the testimony and act as your judgments and your consciences convince you you should in the light of all the proof.

Something has been said during the progress of the trial in regard to the conduct of Mr. Ray, one of the witnesses for the government, and a government officer, which it seems to me it is proper I should allude to. The post-office department has on its staff a class of officers known formerly as special agents. They are now, by a later statute, denominated post-office inspectors. The duties of these inspectors are very fully stated in some regulations of the post-office department which I will read to you. I will read regulation, section 18; also section 30. [Reading regulations, sections 18 and 30.] You see very comprehensive powers are delegated to these agents. They are charged with seeing that the mails are not abused, and the nature of the duty which devolves upon them is the duty of seeing that the mails are not prostituted to be used for fraudulent purposes. You will say then, in view of the powers with which Mr. Inspector Ray is clothed, under these rules, whether the testimony in this case disclosed any undue or improper zeal in the performance of the duties which necessarily devolved upon him in the preparation and prosecution of this case. Do you see anything which, as a sworn officer of the government, exercising these high powers, he ought not to have

done?   A man charged with the arrest and punishment, the ferreting out, of men engaged in fraudulent enterprises, or enterprises which he believes for the time being to be fraudulent, may, from the common instinct which animates every honest man, be anxious that the guilty be brought to punishment.   He may show an interest in that direction, and it is not to his discredit, certainly, that he does show such an interest.

It comes back, then, to this, does the proof in this case, when all considered together, satisfy you beyond a reasonable doubt that these defendants intended to defraud the subscribers to "Fund W" of the money which those subscribers should be induced to send them?   Were the mails to be used for the purpose of effecting fraud, and were they so used?   If you so find that defendants, or either of them, did so intend to defraud, then you should find the defendants guilty, or such one of them as devised or managed the scheme, without regard to whether his name appeared as principal or not.   If, on the contrary, the testimony satisfies you that defendants intended to use and did use "Fund W" for the purpose of dealing in grain, provisions, and stocks, and that such fund was lost by such dealings in good faith, then defendants should be acquitted.   So, also, you must be satisfied from the proof that at the time these subscribers to "Fund W" were induced to intrust their money to defendants it was defendants' intention to convert such money to their own use; that is, if the fraudulent conversion was an afterthought, conceived and acted upon after the defendants had obtained the money, then you should acquit.   If at the time they got the money—the time it came into their hands—they intended in good faith to carry out their scheme, and invest it, but afterwards, after they got it in their hands, then converted it to their own use, then the case is not made out under the statute.