### SHEPARD v. UNITED STATES.

(Circuit Court of Appeals, Eighth Circuit. January 13, 1908.)

No. 2,477.

1. POST OFFICE—OFFENSES AGAINST POSTAL LAWS—MAILING MATTER RELATING TO OBSCENE BOOKS—INDICTMENT.

In an indictment under Rev. St. § 3893, as amended by Act Sept. 26, 1888, c. 1039, § 2, 25 Stat. 496 (U. S. Comp. St. 1901, p. 2658), an averment that defendant knowingly deposited in a post office for mailing circulars giving information how, where, of whom, and by what means obscene, lewd, and lascivious books might be obtained, and that defendant unlawfully and knowingly meant and intended thereby to give such information is a sufficient averment that defendant knew the character and contents of such circulars, and it is not necessary to set out the same, nor to further characterize or describe the books referred to therein, than to aver that they are obscene, lewd, and lascivious.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 40, Post Office, § 70.
Nonmailable matter, see note to Timmons v. United States, 30 C. C. A. 79.]

2. SAME—MAILING OF PROHIBITED MATTER—DEPOSITING IN LETTER BOX.

Under such an indictment an averment that prohibited matter was deposited in a post office is sustained by proof that it was deposited in a letter box placed by the government for receiving mail, and was taken by

its agents from such box to the post office, and there stamped and sent out.

3. CRIMINAL LAW—EVIDENCE—ACCOMPLICES—DECOY LETTERS.
The writing of decoy letters by agents of the post office department to a person suspected of violating the postal laws which induced such person to send unmailable matter in return is legitimate, and does not make such agents parties to the offense so as to render their testimony subject to the rule relating to accomplices.
[Ed. Note.—For cases in point, see Cent. Dig. vol. 14, Criminal Law, § 1086.]

4. SAME—INSTRUCTIONS—REASONABLE DOUBT.
It is the better practice to address instructions to the jury as a whole, and an instruction on the subject of reasonable doubt in a criminal case is not erroneous because it is so addressed and not to each juror individually.

5. POST OFFICE—OFFENSES AGAINST POSTAL LAWS—INDICTMENT FOR MAILING PROHIBITED MATTER.
An indictment charging that a defendant deposited in the mails unmailable matter includes the charge that he caused such matter to be deposited, it being immaterial whether he deposited it by his own hand or by an agent.

6. CRIMINAL LAW—WRIT OF ERROR—REVIEW—INSTRUCTIONS.
The charge of a court cannot be reviewed except as to matters to which exception was taken.
[Ed. Note.—For cases in point, see Cent. Dig. vol. 15, Criminal Law, § 2656.]

7. POST OFFICE—OFFENSES AGAINST POSTAL LAWS—TRIAL—INSTRUCTIONS.
Instructions in a prosecution for depositing prohibited matter in the mails considered, and *held* free from prejudicial error.

In Error to the District Court of the United States for the District of Utah.

Jesse B. Roote and Harrison O. Shepard (S. P. Armstrong, on the brief), for plaintiff in error.

Hiram E. Booth, U. S. Dist. Atty. (William M. McCrea, Asst. U. S. Dist. Atty., on the brief), for the United States.

Before SANBORN, and VAN DEVANTER, Circuit Judges, and PHILIPS, District Judge.

PHILIPS, District Judge. The plaintiff in error (for convenience hereinafter designated the defendant) was indicted under the act of Congress approved September 26, 1888, c. 1039, § 2, 25 Stat. 496 (U. S. Comp. St. 1901, p. 2658), for depositing in the mails letters, pamphlets, etc., giving information where, how, of whom, and by what means obscene, lewd, and lascivious books, adapted for indecent and immoral use might be obtained. He was convicted on two counts, and sentenced to imprisonment in the Utah State Prison, at hard labor, for 13 months. As by the judgment the sentences imposed were to run concurrently, if either of the counts of the indictment is sufficient in law it will support the judgment. It is, therefore, unnecessary to set out and review both counts, and we select the second count for consideration, on which the defendant was found guilty.

It charges that on or about the 1st day of June, 1905, in the state and district of Utah, the defendant received a letter addressed to the

Shepard Book Company, at Salt Lake City, Utah, of the following tenor:

"Denver, Colo., May 30, 1905.

"Shepard Book Co., Salt Lake City, Utah—

"Gentlemen: I believe you have a catalogue of erotic books which you have for sale, and I wish you would send me one. If you have on hand any books that are right and not listed in the catalogue, please advise me concerning them, and prices.

"Yours truly,                                   G. G. Latimer, Box 848."

The indictment then charges:

"That on the day and year first aforesaid the said Richard B. Shepard then and there had in his possession and under his control a large number (the exact number being to the grand jurors unknown) of obscene, lewd and lascivious books of an indecent character and intended and adapted for an indecent and immoral use, and that said Richard B. Shepard, in response to the said letter, on the first day of June, one thousand nine hundred and five, did then and there unlawfully, feloniously and knowingly, deposit in the post office of the United States at Salt Lake City, Utah, for mailing and delivery a written and typewritten letter and notice, and three printed circulars, giving information directly and indirectly to one G. G. Latimer, and divers other persons whose names are to the grand jurors unknown, and for that reason cannot be herein stated, how, where, of whom and by what means obscene, lewd, and lascivious books of an indecedent character, and intended and adapted for an indecent and immoral use, might be obtained, which said letter and notice and which three circulars were then and there nonmailable matter, and were then and there contained in an envelope bearing and having thereon the address and superscription following, to wit, 'G. G. Latimer, Box 848, Denver, Colo.,' and which said letter and notice is of the following tenor:

"'Salt Lake City, Utah, U. S. A., 6–1–05.

"'G. G. Latimer, Box 848, Denver, Colo.—

"'Dear Sir: In reply to yours of the 30th ult. would say that we send you our catalogue of erotic literature also our latest catalogue. Please return Catalogue No. 11 as it is a part of our file. Outside of what is listed in our catalogue, we have two or three unexpurgated editions of Boccaccio's Decameron and a book entitled "The Amorous Adventures of a Japanese Gentleman." If you are interested in these we will describe to you. This is all we have at present. If you desire any particular books on this subject, we can procure for you anything in the line. We inclose you herewith catalogues of erotic literature which we can furnish you at prices quoted in catalogue, you to pay duty if there is any. They are in Europe. If you desire any of them, remit us the amount and we will have them sent to you by prepaid. Please return the catalogue inclosed, also.

"'Yours,                       Shepard Book Company, Per ———.'

"And the first of which said circulars consisted of sixteen (16) printed pages, and on the first and front page of which were printed the following words: 'List of Rare and Curious Books,' and on which said page of said circular were written the words 'Please return'; and the second of which said circulars consisted of four (4) printed pages, on the top of the first and front page of which were printed in red ink, the following words: 'Privately Printed English Books,' and on which said page were written the following words: 'Please return'; and the third of which said circulars consists of four (4) printed pages, on the top of the first and front page of which were printed the following words: 'Privately Issued Books,' and on which said page were written the words 'Please return'—and the grand jurors aforesaid, upon their oaths aforesaid, do further present that, on the day and year aforesaid the said Richard B. Shepard when he so deposited said last-named letter and notice and said three printed circulars in said post office, unlawfully, knowingly, and feloniously meant and intended thereby to give notice, and did thereby give notice and information to the writer of the said first-named letter, viz., to said G. G. Latimer, and divers other persons whose names are to the grand

jurors aforesaid unknown, where, how, of whom, and by what means obscene, lewd, and lascivious books of an indecent character, and intended and adapted for an indecent and immoral use, might be obtained, contrary," etc.

The defendant both demurred to and filed motion to quash said count. The principal grounds of objection raised are: (1) It does not allege that the defendant knew any of the books in his possession were obscene, lewd, or lascivious; (2) it does not allege that when said letter, etc., was deposited in the post office the defendant knew that the letter or circulars had any reference to any obscene, lewd, or lascivious books, or that he knew either the contents of the letters or of the alleged circulars; (3) it is not alleged what books are referred to; (4) it is not alleged that any book, pamphlet, letter, or other publication referred to was obscene, lewd, lascivious, or indecent; (5) it is not alleged that the circulars contained any reference to any obscene, lewd, or lascivious book, pamphlet, etc., of an immoral or indecent character; (6) there was no sufficient description of any book respecting which the defendant gave information as to where the same might be obtained; and (7) it does not set out the character and contents of said alleged book or books so that it can be seen whether the books are obscene, lewd, lascivious, or indecent. Other objections are but repetitions of the foregoing.

Counsel for the defendant seem to have misconceived the provision of the statute on which this indictment was predicated. The statute declares to be nonmailable, and inhibits the conveyance in the mails and delivery from any post office, or by any letter carrier, every obscene, lewd, or lascivious book, pamphlet, picture, paper, letter, writing, print, or other publication of an indecent character; also every article or thing designed or intended for the prevention of conception or procuring of abortion; and also every article or thing intended or adapted for any indecent or immoral use. It then declares that:

"Every written or printed card, letter, circular, book, pamphlet, advertisement or notice of any kind, giving information, directly or indirectly, where or how, or of whom, or by what means any of the hereinbefore mentioned matters, articles, or things, may be obtained or made, whether sealed as first-class matter or not, are hereby declared to be non-mailable matter, and shall not be conveyed in the mails nor delivered from any post-office or by any letter-carrier.

"Any person who shall knowingly deposit, or cause to be deposited, for mailing or delivery, anything declared by this section to be non-mailable matter, shall, for each and every offense, be fined upon conviction thereof not more than five thousand dollars, or imprisoned at hard labor not more than five years, or both, at the discretion of the court."

As shown from the foregoing transcript of the indictment, it is predicated of the provision inhibiting the use of the United States mails for giving information, directly or indirectly, where such article or thing adapted to such immoral use may be obtained. The underlying purpose and design of this statute is to deny the use of the post office department, maintained by the government to promote the public welfare, for the dissemination of that class of literature which, by reason of its obscenity, lewdness, lasciviousness, or of a like indecent character, is calculated "to deprave and corrupt those whose minds are open to such immoral influences, and into whose hands a publica-

tion of this sort may fall, and where it would suggest to the minds of the young of either sex, or even to persons of more advanced years, thoughts of the most impure and libidinous character." Rex v. Hicklin, L. R. 3 Q. B. 360; United States v. Harmon (D. C.) 45 Fed. 417.

The indictment in question, after setting out the letter addressed to the Shepard Book Company, which is alleged to have been received by the defendant, distinctly alleges that he then and there had in his possession and under his control a large number of obscene, lewd, and lascivious books of an indecent character, intended and adapted for an indecent and immoral use, and that in response to said letter he then and there unlawfully, feloniously, and knowingly, deposited in the post office at Salt Lake City, Utah, for mailing and delivery, a letter and notice, and printed circulars, giving information directly and indirectly to one G. G. Latimer, and divers other persons unknown, etc., how, where, of whom, and by what means such forbidden matter might be obtained. The letter alleged to have been so mailed by him is then set out hæc verba. In that letter he inclosed a catalogue of erotic literature, and advised the addressee that outside of the books listed in the catalogue he had some unexpurgated editions of Boccaccio's Decameron, and a book entitled "The Amorous Adventures of a Japanese Gentleman," and stating that if the addressee desired any particular books on such subject he could procure him anything in the line, stating that they are in Europe. The indictment further charges that when said Shepard deposited said last-named letter, notice, and printed circulars in said post office, he "unlawfully, knowingly, and feloniously meant and intended thereby to give notice, and did thereby give notice and information, to the writer of the first-named letter, viz., to said G. G. Latimer, and divers other persons whose names are to the grand jurors aforesaid unknown, where, how, of whom, and by what means obscene, lewd, and lascivious books of an indecent character, and intended and adapted for an indecent and immoral use, might be obtained." When it is averred that the defendant knowingly deposited such matter in the post office for mailing and delivery, giving information, etc., it certainly was an averment that he knew what the letter, circular, etc., were. If there was any uncertainty in this averment of knowledge of the contents, it is certainly supplied by the further distinct allegation that the defendant "unlawfully, knowingly, and feloniously meant and intended thereby to give notice, and did thereby give notice and information to the writer of the first-named letter, and divers other persons,  *  *  *  where, how, of whom, and by what means" the forbidden literature might be obtained. De Gignac v. United States, 113 Fed. 197, 52 C. C. A. 71; Swearingen v. United States, 161 U. S. 446, 16 Sup. Ct. 562, 40 L. Ed. 765. The indictment gives a sufficient description of the circulars or catalogues sent to enable the defendant to understand what books were referred to, and to sufficiently advise him in the preparation of his evidence to meet the issue. Section 1025, Rev. St. (U. S. Comp. St. 1901, p. 720), declares that:

"No indictment found and presented by a grand jury in any district or circuit or other court of the United States shall be deemed insufficient, nor shall the trial, judgment, or other proceeding thereon be affected by reason of any

defect or imperfection in matter of form only, which shall not tend to the prejudice of the defendant."

There is nothing on the face of this statute indicating any difference whether an indictment is attacked after conviction or in limine for any of the specified defects. The plain declaration is that no indictment shall be deemed insufficient, or the trial, judgment, or other proceeding thereon be affected, by reason of any defect or imperfection in matter of form only, which shall not tend to the prejudice of the defendant. The evident purpose and mind of Congress in enacting this statute was that regard should be had to substance rather than form in construing indictments. So, while the indictment must, with intelligible, identifying description, affirmatively charge the substantive statutory offense. leaving nothing to mere inference, the trend of modern decisions in the federal courts is that the indictment is sufficiently explicit if it advise the accused, in advance of the trial, of the nature and character of the offense he may come to meet. Accordingly, Mr. Justice Harlan, in Rosen v. United States, 161 U. S. 30, 33, 16 Sup. Ct. 434, 40 L. Ed. 606, speaking of the constitutional provision requiring the accused to be informed of the nature and cause of the accusation, said:

"The defendant is informed of the nature and cause of the accusation against him if the indictment contains such description of the offense charged as will enable him to make his defense and to plead the judgment in bar of any further prosecution for the same offense."

Further on he said:

"He (the defendant) must have understood from the words of the indictment (that he unlawfully, willfully, and knowingly deposited and caused to be deposited the alleged obscene paper) that the government imputed to him knowledge or notice of the contents of the paper so deposited. * * * The ordinary acceptation of the words 'unlawfully, willfully, and knowingly,' when applied to an act or thing done, imports knowledge of the act or thing so done, as well as an evil intent or bad purpose in doing such thing."

In Cochran v. United States, 157 U. S. 286, 290, 15 Sup. Ct. 628, 39 L. Ed. 704, Mr. Justice Brown said:

"The true test is not whether it (the indictment) might possibly have been made more certain, but whether it contains every element of the offense intended to be charged, and sufficiently apprises the defendant of what he must be prepared to meet, and, in case any other proceedings are taken against him for a similar offense, whether the record shows with accuracy to what extent he may plead a former acquittal or conviction."

Judge Adams, speaking for this court in Clement v. United States, 149 Fed. 305, 79 C. C. A. 243, has reviewed the decisions of the Supreme Court and expressed the same view of the requirements of criminal pleading. See, also, Rinker v. United States, 151 Fed. 755, 81 C. C. A. 379; Stearns v. United States, 152 Fed. 901, 82 C. C. A. 48; Nurnberger v. United States (C. C. A.) 156 Fed. 721. The insistence of counsel that the indictment should set out the contents of the circulars or pamphlets referred to in the correspondence would lead to such exaction in pleading as would but create intricate mazes to ensnare the prosecutor and obstruct justice. In United States v. Grimm (D. C.) 50 Fed. 529, Judge Thayer said:

"A letter is nonmailable if it in fact conveys, and was intended to convey, information to any person where obscene pictures or literature may be obtained, even though to a casual reader it may seem harmless. The court further holds that in a prosecution of this character the government is not confined to the letter itself, but may show by any competent extrinsic testimony that the letter gives information which the statute prohibits being given through the mail, and that it was in fact intended to convey such information. If the character of a letter cannot be thus shown by extrinsic facts, the statute under which this indictment is drawn could be easily evaded and would prove a dead letter."

This case was affirmed by the Supreme Court in 156 U. S. 604, 15 Sup. Ct. 470, 39 L. Ed. 550, the syllabus of which is as follows:

"A letter, however innocent on its face, intended to convey information in respect of the place or person where or of whom the objectionable matters described in the act could be obtained, is within the statute. In an indictment for a violation of that act it is sufficient to allege that the pictures, papers, and prints were obscene, lewd, and lascivious, without incorporating them into the indictment, or giving a full description of them."

The evidence in this case shows that for many years prior to the time in question the defendant had been a practicing lawyer, had attained considerable eminence in his profession, and was regarded by the community in Salt Lake City as a man of probity and honor. Not long prior to the indictment he became interested in the bookstore in question. Having a fondness for what he termed "erotic," or curiosities in, literature, without much discrimination as to their moral character as evinced by the evidence, he gave especial attention to the collection of such books. Finally he became actively engaged as the directing spirit of the bookstore. Coming under suspicion of being engaged in the sale and dissemination of obscene, lewd, and lascivious books, and of employing the public mails for exploiting them, inspectors, under the authority of the post office department, entered upon an investigation to ascertain the facts. One of these was Robert W. McAfee, a man of long experience in this branch of the public service, and one G. G. Latimer, Chief Clerk for the Denver Division of Post Office Inspectors, who opened correspondence with the defendant through the mails, evidenced by the letters named in the indictment. Other similar correspondence on the subject-matter passed between them and the defendant, which appears in evidence, admissible on the issue of the defendant's guilty knowledge as to the character of the books. That the defendant directed and conducted this correspondence, and gave especial attention to the class of books in question, clearly enough appears in the evidence. He not only had in his store some of the class of books named in the catalogue or circulars referred to, but he had arrangements by which he could obtain such books from Paris. The evidence also disclosed what these books were, and it is sufficient to say they are most salacious and immoral, of well-known vicious character; and that he also sold them and knew what they were. In the letter of June 16, 1905, from Latimer to the Shepard Book Company, acknowledgment is made of the receipt of the letter relative to "erotic" books in which the writer said, "I wish you would send me full particulars of 'Amorous Adventures of a Japanese Gentleman,' Boccaccio's Decameron, and Fanny Hill if you have one

in stock and can ship upon receipt of order." July 19, 1905, came a letter in reply from the Shepard Book Company in which it was stated that the Amorous Adventures of a Japanese Gentleman was privately printed on antique paper, is very erotic and very scarce; price $7.50. That "Nights in a Moorish Harem, by Lord George Herbert, privately printed and a verbatim reprint, original wrappers, fair condition, cost $3;" also Boccaccio's Decameron, translated into English, complete and unexpurgated, illustrated with 12 beautiful, but somewhat "free," photogravure plates; that the portfolio of extra plates, on account of their free character, was issued separately, with an extra page containing an English version of some "free" passages heretofore always given in a foreign tongue. It was stated that the Decameron of Giovanni Boccaccio, now first completely done into English prose and verse, privately printed, etc., could be had for $12. Further on the letter said:

"In regard to Fanny Hill, we can get a copy as per the one in the catalogue sent you. We have none in stock. Please return us the catalogue we sent you as per request in our last letter. *Owing to the U. S. laws, we could not send these books to you either by mail or express* (italics ours), but we will send them to you by freight prepaid upon receipt of price."

To this letter Latimer replied, inclosing $7.50 for "The Amorous Adventures of a Japanese Gentleman," saying, "I would like a copy of 'Fanny Hill'—please advise further concerning it," etc. The receipt of this letter, with the money, was acknowledged on the 28th of July, 1905; and the letter further said:

"Would say that we sent the book by freight yesterday and inclose you bill of lading and trust you will receive it promptly. In regard to the Fanny Hill, we will write you in regard to it, in a few days."

In another letter he wrote that:

"The only Fanny Hill that we can furnish you, not having the same in stock, is a copy in the catalogue we sent you. We can have it sent you direct from Paris. on .the terms prescribed in our letter to you, of the 19th inst. at the price, $7.50, provided you pay duty, if any there should be on the book. The book is No. 59 of the list of rare and curious books we sent you. If you desire, let us know and kindly return to us the catalogues we sent you, as we need them."

In another letter sent by Latimer to the book company the receipt of The Amorous Adventures of a Japanese Gentleman was acknowledged. The letter said:

"This is certainly a dandy. Have you anything better? By 'better' I mean more erotic. If not, what have you that is just as good—something that will not have to be shipped from Paris."

The letter inclosed a money order for $20.50, part of which was to pay for the Boccaccio Decameron, "complete and unexpurgated," with the pictures. This letter also asked for Nights in a Moorish Harem. Three days later a reply to this came from the book company, stating that:

"We to-day send you by prepaid express the set of Boccaccio's Decameron you ordered of us. We are sorry to say that we have sold the other book you mentioned and have given you credit for the $3.00, which, if you wish returned, we will return to you or else just keep to your credit. *I* (italic ours) have

no pictures in stock, but have a great many books on classical erotica, but nothing as *rank* (italic ours) as the book we sent you by freight. The Carrington matter is very erotic, but the only way we could get them would be to ship direct to you from Paris."

The evidence tended to show, as already stated, that this correspondence was directed by the defendant, and his admissions made to three witnesses, whom he did not take the stand to contradict, if credited, would clearly show that he was not only acquainted with the books as of the character denounced by the statute, but that he had been selling them, and employed the mails for the purpose of exploiting them.

What the assignment of errors lacks in quality is made up in quantity. They are 134 in number. As is generally the case, such interminable assignments instead of impressing the court with the thought of an imperfect trial, rather cast discredit upon the worth of any of them. In Times Publishing Company v. Carlisle, 94 Fed. 762–781, 36 C. C. A. 475, Judge Sanborn, quite aptly hit this too common practice:

"When counsel of the learning and ability of those who presented this case gravely announce to an appellate court that they rely upon 74 alleged errors for a reversal of the judgments against their clients, and some of those specified turn out to be as frivolous as those we have just cited, it is at least difficult to resist a suspicion that they themselves were not certain there was any substantial error in the case."

After a careful review of the evidence we perceive no reversible error in the admission or rejection of testimony. A large number of special instructions were asked by the defendant. We will consider such of them as are deemed of importance.

The first instruction requested a directed verdict. This was properly refused. The second, third, and fourth asserted that it devolved upon the government to show beyond a reasonable doubt that the objectionable matter was deposited by the defendant in the post office at Salt Lake City, or that the defendant caused the same to be so deposited. And that it must be shown that the defendant at the time knew the matter mailed contained the objectionable literature; and that the jury were trying the defendant only for the use of the mail, and not the selling or passing of obscene or indecedent matter. The substance of these requests was more concisely and appropriately covered by the charge of the court.

The fifth instruction refused, among other things, requested the court to declare that if the jury should find that said letters were deposited in a letter box the offense charged was not sustained. The court's charge required that the jury should find that the depositing was in the post office at Salt Lake City, Utah. The presumption is that in finding the defendant guilty the jury found that the letters, circulars, or pamphlets in question were deposited in said post office. We fail to discover any evidence in the record that the letters named in the indictment were deposited in a letter box. The envelopes showed that they bore the stamp of the Salt Lake post office. Even if any of them had been first deposited in a letter box it would constitute no variance. Such boxes belong to the government and are under its exclusive control. They are placed in cities, like Salt Lake City, as a receptacle for mail matter for the convenience of patrons of the office. They

are but adjuncts of the post office. It is common knowledge that when a person deposits a letter or other article in a mail box, it is to be taken therefrom by a letter carrier or collector and carried to the post office, where it is stamped with the canceling stamp of the office and forwarded to its destination. In legal effect, as applied to this indictment, it is not different had the defendant laid the letter or other article, after addressing and stamping it, on his desk or other customary place, to be taken and carried by his clerk or servant to the post office for mailing. The denunciation of the statute is against the depositing of the inhibited matter "for mailing or delivery." The charge that such matter was deposited in the post office at Salt Lake City would be sustained by proof that it was deposited in a mail box in the city, then stamped and sent out by the post office of said city.

The next refused instruction is as follows:

"You are instructed that when a person is known to be about to commit a crime, any other person may join with him with the ostensible purpose of aiding in the commission of the contemplated offense, and if his real purpose is to secure evidence for the purpose of punishing the offender, the person so joining in the offense will not be a criminal or an accomplice by encouraging the offender; but if any person solicits another to do an act forbidden by the law, and the thing is done wholly as the result of such solicitation, and would not have been done otherwise, the person soliciting the act, if the act be criminal, becomes himself a principal offender and an accomplice, and is equally guilty with the person whom he solicited, notwithstanding his object may be merely to secure the conviction or punishment of the person whom he solicits to the offense, for the law does not permit any man to aid and encourage the breaking of the law merely to secure evidence that it has been broken; and, therefore, I instruct you that if you believe that any person, who has testified on behalf of the government in this case, is under the law, as I have stated it, an accomplice, then, you ought not to convict the defendant upon the testimony of any such person, unless he be corroborated upon some material point, which of itself and without the aid of the testimony of such witness, tends to prove the defendant guilty."

This instruction was leveled at the witnesses McAfee and Latimer, who had conducted the correspondence with the defendant's book concern. A resort to such means of obtaining information by the post office department as to whether the party suspected is engaged in employing the mails for the dissemination of such vicious, immoral literature, has been approved so often by the courts as to place the practice beyond the field of discussion. It was approved by Judge Thayer in United States v. Grimm, supra, in respect of a like action by the witness McAfee. This was affirmed by the Supreme Court (156 U. S. 604-610, 15 Sup. Ct. 470, 39 L. Ed. 550), in which Mr. Justice Brewer has so fully and effectually met counsel's criticism of such practice that nothing we might say would add to its weight or re-enforce its conclusiveness. See, also, Andrews v. United States, 162 U. S. 420, 16 Sup. Ct. 798, 40 L. Ed. 1023.

Had the requested instruction been given in its entirety it would have been essentially vicious. In cunning phraseology it conveyed the thought that in the act itself the inspectors had subjected themselves to criticism; that the jury might regard them as accomplices by inducing the violation of the statute, unless they were "corroborated upon some material point, which of itself and without the aid of the

testimony of such witness, tends to prove the defendant guilty." This in the face of the uncontradicted fact that the letters and pamphlets had passed through the post office, that the defendant admitted authorship of the letters, and the indisputable evidence that he knew the vicious character of the books sought.

Touching this matter the court charged the jury as follows:

"Comment has been made as to certain decoy letters which were introduced in evidence. Considerable criticism has been indulged in at the expense of the writers of those letters. The defendant is the only person on trial before you —not the writers of those letters. It is no defense, even if those parties are guilty of wrongdoing; you are not called on to find them guilty of any offense —you are to be satisfied of the guilt of the defendant. But, if the evidence shows that in writing these decoy letters, any of the parties who have testified have acted in a reprehensible way, you can of course consider that fact in determining the weight that you will give to their testimony."

Further on the court said in its charge:

"Comment has been made upon the fact that McAfee, by a decoy letter, had induced the commission of the offense, and hence, his evidence should be discredited. Considering the fact that he did write the decoy letter, you can give it such weight as you think it is entitled to in determining the weight which you finally decide should be given to his testimony. It may be that in ferreting out crimes of the character here charged, it can only be successfully done by writing decoy letters; that the men concerned in breaking the law, the man who is the actual purchaser or desires to purchase, and the seller, are both likely to conceal that fact; and that the only way direct evidence can be obtained may be by this method. However that may be, so far as McAfee's testimony is concerned, you will give it that weight which you think it is entitled to. There is no evidence that the other witness, Mr. Sharp, who testified as to statements made by the defendant, was concerned in what has been declared to be a solicitation of a violation of the law. Besides that, the envelopes are introduced in evidence. You can compare the writing on these envelopes with any other writing which has been introduced in evidence in the case which you are satisfied, from the evidence, is the actual handwriting of the defendant, and in making such comparison, may draw any legitimate conclusion as to who was the writer of these envelopes."

The charge of the court was certainly favorable enough to the defendant. The defendant made several requests respecting the effect of the proof of the defendant's good character. It is sufficient to say that in the charge the court accorded to the defendant all the law entitled him to in this respect. The same is true of complaints made of the refusal of the court to give the repetitious instructions, in varying terms, respecting the weight to be given to the admissions of the defendant, testified to by witnesses. One of the instructions refused contained the usual proposition of the presumption of innocence, and the requirement that in order to convict the evidence must satisfy the jury beyond a reasonable doubt of the defendant's guilt; to which was added the following:

"And as long as any of you have a reasonable doubt as to the existence of any one of the several elements necessary to constitute the offense or offenses charged, the accused cannot be convicted."

The charge of the court was as follows:

"In this case the defendant is accused of an offense of which he is presumed to be innocent until his guilt is proven beyond a reasonable doubt. This presumption of innocence attends him throughout the case and until, after a

consideration of all the evidence, you are satisfied beyond a reasonable doubt of his guilt. By reasonable doubt is not meant every possible doubt, but is meant that kind of a doubt that would suggest itself to a reasonable man and of such weight as to deter him from acting or deciding in matters of the highest importance to him. If you have such a doubt of the defendant's guilt, it is your duty to find him not guilty. If, on the other hand, you have no such doubt, but are persuaded of that guilt to a moral certainty, it is your duty to find him guilty."

The objection pressed by defendant is that the charge of the court failed especially to suggest to the jury that so long as any one of their number entertained such reasonable doubt, no verdict of guilty could be returned. The charge of the court, as is customary, was directed to the whole jury. Some state courts have said that the accused is entitled to such special direction to each juror; but we are of opinion that the better reason, as the better practice, is to direct instructions on all questions of law and fact to the jury as a body, and not to them individually. A juror qualified to sit in the box knows that it requires the concurrence of the 12 to make a verdict. This includes his judgment upon every element of fact and law bearing upon the issue of guilt or innocence. Why, therefore, in an instruction seek to evoke the individual, independent notion of a juror, thereby arousing his self-assertion and possible antagonism to his fellows? Certainly it is not in accord with the spirit of what was said by Mr. Justice Brown, in Allen v. United States, 164 U. S. 501, 502, 17 Sup. Ct. 154, 41 L. Ed. 528:

"While, undoubtedly, the verdict of the jury should represent the opinion of each individual juror, it by no means follows that opinions may not be changed by conference in the jury room. The very object of the jury system is to secure unanimity by a comparison of views, and by arguments among the jurors themselves. It certainly cannot be the law that each juror should not listen with deference to the arguments and with a distrust of his own judgment, if he finds a large majority of the jury taking a different view of the case from what he does himself. It cannot be that each juror should go to the jury room with a blind determination that the verdict shall represent his opinion of the case at that moment; or, that he should close his ears to the arguments of men who are equally honest and intelligent as himself."

Such an appeal to the individual notions of each juror in instructions would produce hung juries rather than promote the ends of justice. State v. Taylor, 134 Mo. 109, 35 S. W. 92, Sherwood, Judge; State v. Rorabacher, 19 Iowa, 154; 2 Thompson, Tr. § 2495; Blashfield Instructions to Juries, vol. 1, § 303, and citations.

Criticism is made of the charge of the court wherein he said that if the defendant deposited, or caused to be deposited, the mail matter in question in the post office it would be sufficient. Contention is made that this was an extension of the allegation of the indictment, which only charged that the defendant deposited the letters, etc. It would be a sufficient answer to this to say that no exception was taken to this part of the charge of the court. Moreover, in all the requests made by defendant touching this issue, he employed the same language, that the defendant deposited or caused to be deposited, as given in substance by the court. Consensus tollit errorem. Noble v. Blount, 77 Mo., loc. cit. 241. It is true the statute says "who shall deposit or cause to be deposited." The latter alternative was evidently added by the framer

of the statute out of abundant caution. But in legal effect it is embraced in the charge that the defendant deposited the letters, etc. If A. commits a letter to B. to take to the post office and mail it, the latter acts as A.'s agent. Facit per alium facit per se. United States v. Flemming (D. C.) 18 Fed. 907–908; Bates v. United States (C. C.) 10 Fed. 92.

Criticism is made in argument of the employment of the word "highest" in the charge above quoted respecting the matter of reasonable doubt. Even if it were conceded that the term was extreme, it is sufficient to say that no exception was taken thereto. The only exceptions taken to the court's charge are: (1) To the failure and refusal of the court to give each request made by the defendant which are not embraced in the instructions given (which was considered as having been made as to each request); (2) "to the giving of that part of the charge of the court in which the jury was instructed concerning the books on hand showing a knowledge on the part of the defendant as to their contents, or words to that effect; and also to that part of the charge of the court as to what would be a depositing or causing to be deposited of obscene matter."

Counsel for defendant have discussed many questions not raised at the trial, and not properly preserved in the bill of exceptions. A careful examination of the record satisfies us that the defendant had a fair and impartial trial, during which the court, under exasperating annoyances, displayed marked equipoise and judicial temper.

Finding no reversible error in the record, the judgment of the District Court must be affirmed.